UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROMULO TORRES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BOTANIC TONICS, LLC, et al.,<br><br>Defendants. | Case No.  23-cv-01460-VC<br><br>**ORDER DENYING 7-ELEVEN'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 31 |

This is a case about a drink called Feel Free, which allegedly contains large amounts of a dangerous, addictive ingredient called kratom. The plaintiffs have sued the drink's manufacturer, along with two retailers who sold Feel Free to them. One of the retailers is 7-Eleven, whose stores sold the drink to plaintiff Romulo Torres. Although the other defendants have filed answers to the complaint, 7-Eleven has filed a motion to dismiss the claim brought by Torres.

Torres brings his claim under the "unfair practices" prong of California's Unfair Competition Law. He asserts that 7-Eleven controlled decisions about which products could be sold in its stores and knew full well that Feel Free was dangerous and addictive. Torres contends that 7-Eleven's decision to allow this product to be sold in its stores, at least without disclosing to customers how harmful it could be, constitutes an unfair business practice within the meaning of the statute.

7-Eleven makes one argument in support of dismissal: that there can be liability under the unfair-practices prong based on a failure to disclose information only if the defendant had a preexisting duty to disclose that information from some other source of law. 7-Eleven focuses on the California common law test for fraud claims based on omissions, and it argues that since

Torres cannot allege fraud under that common law test, by definition, he cannot state an unfair-practices claim under the Unfair Competition Law.

A couple of cases contain language that, when taken out of context, might appear to support 7-Eleven's argument. But the argument is wrong. Liability for a failure to disclose under the unfair-practices prong must be determined by applying the tests established by California courts for whether a practice violates that provision of the unfair competition law. Those tests do not simply incorporate duties found in other sources of law. Rather, they demand a fact-specific inquiry into the practice in question, and that fact-specific inquiry governs even when the practice in question is an alleged failure to disclose. The Legislature intended the unfair-practices prong to reach beyond existing law, to capture practices that should result in liability but that legislatures and courts had not yet envisioned. Depending on the facts, if a seller knows that a product poses a serious danger to its consumers and chooses to sell it without warning of the danger, that seller could potentially be liable under the unfair-practices prong even if there would be no liability for failure to disclose under any other statutory or common law cause of action.

It's unclear whether the allegations in the complaint state a claim for violation of the unfair-practices prong. In particular, the allegations that 7-Eleven knew of all the dangers described in the complaint at the time Torres bought the product seem rather sparse. But because 7-Eleven's only argument is a categorical one—that there can never be liability under the unfairness prong unless some other source of law imposes a duty to disclose—the motion to dismiss must be denied.

## I

Feel Free was marketed by its manufacturer, Botanic Tonics, as a "feel good wellness tonic" that people can drink when they "want to feel more social, need a clean boost of energy, or need to lock in and focus." Dkt. No. 26 at 9. Botanic Tonics allegedly described Feel Free as a "kava drink" and frequently touted the safety of that ingredient. *E.g.*, *id.* at 10 ("When you enjoy a kava drink, you don't have to worry about side effects. The same can be said of Botanic Tonics' kava drink, the Feel Free Wellness Tonic."). Botanic Tonics also allegedly emphasized

2

that Feel Free was no more addictive than sugar or caffeine. *Id.* at 11. Using those claims about the product, Botanic Tonics allegedly marketed Feel Free "as a means to quit alcohol" and as a "safe, healthy, and sober alternative to alcohol" for "individuals working on sobriety." *Id.* at 9, 11, 15. The complaint asserts that Botanic Tonics "posted over a thousand advertisements on Instagram, repeatedly using the hashtag #alcoholalternative." *Id.* at 13. And the company allegedly marketed extensively to college students, including by using on-campus ambassadors and offering free samples. *Id.* at 12–13.

But according to the complaint, Feel Free's primary ingredient was not kava, but kratom—a fact that was disclosed neither on the label nor in the company's marketing. *Id.* at 15. Per the complaint's excerpts of an FDA report, "kratom affects the same opioid receptors as morphine," and it "has similar effects to narcotics like opioids, and carries similar risks of abuse, addiction, and in some cases, death." *Id.* at 16. Kratom can allegedly cause both mild side effects (like nausea and sweating) and severe ones (like respiratory depression, seizure, hallucinations, and psychosis). *Id.* at 17. Apparently, because of these features, which are "known in the scientific community," substance abuse treatment and rehabilitation centers treat patients for kratom abuse. *Id.* Further, the complaint alleges that Botanic Tonics used a "concentrated dose" of kratom in the drinks and "manipulated the formula for Feel Free" to supercharge the effects of the kratom, "leading to a faster, stronger, and longer-lasting high." *Id.* at 18.

According to the complaint, plaintiff Romulo Torres had struggled with alcoholism for years, including a hospitalization in 2011 and a stay at a rehabilitation facility in 2014. *Id.* at 8. He was later able to attain "lasting sobriety." *Id.* But after seeing a "targeted advertisement" for Feel Free on social media, he went to a 7-Eleven store to purchase the product. *Id.* at 8, 22. Allegedly, the product was displayed prominently in the store with the same misleading representations that Torres had seen on social media and without any disclosures about kratom or possible side effects. *Id.* at 22. Not long after, he was spending $3,000 per month on Feel Free, drinking ten per day, unable to "sleep or function" without the product, and suffering strong withdrawal symptoms, including shakes and delirium. *Id.* at 23. The complaint describes

repeated attempts to quit Feel Free. *See id.* It also describes how Torres "turned to alcohol to manage his withdrawals." *Id.* Torres was allegedly admitted to the hospital twice due to severe symptoms from Feel Free: At his first hospital visit, he was admitted with symptoms of alcohol poisoning—but there was no alcohol in his system, only Feel Free. *Id.* At his second visit, he presented with delirium and psychosis. *Id.* Ultimately, he "entered a medical detox facility," and then rehabilitation. *Id.* As a result of his experience with Feel Free, Torres left his job, lost his sobriety, and damaged his romantic relationship. *Id.*

According to the complaint, Torres's experience was not unique. Sam Rosenfield, the other plaintiff, purchased Feel Free through a different retailer, Erewhon, but tells a similar story. *See id.* at 4. And the complaint provides social media testimonials of Feel Free consumers also experiencing serious side effects and addiction. *Id* at 24–26.

The lawsuit is a proposed class action. It names Botanic Tonics as a defendant, along with the two retailers—7-Eleven and Erewhon—involved in selling the product to the named plaintiffs. Torres seeks to represent a class of people who bought Feel Free from 7-Eleven stores, and Rosenfield seeks to represent a class of people who bought the product from Erewhon stores. Botanic Tonics and Erewhon have filed answers to the complaint; 7-Eleven has moved to dismiss the claims brought by Torres.

The complaint alleges that 7-Eleven stores across the country sold Feel Free. *Id.* at 19. It details 7-Eleven's involvement in the operations of its franchise stores, including inventory and store layout. *Id.* at 19–20. It also includes a photograph of a Feel Free display "at the checkout counter," which it alleges was placed "in accordance with guidance from 7-Eleven relating to optimal placement of certain types of products." *Id.* at 20. But then the allegations become more conclusory: There is a claim that 7-Eleven knew not only that its franchise stores were carrying Feel Free but also "that countless individuals were experiencing addiction and dangerous side effects from consuming Feel Free." *Id.* The complaint does not identify a time period when 7-Eleven was aware of Feel Free's issues. But it describes 7-Eleven as intentionally ignoring the dangers, after learning of them, to profit from the sales of the product. That alleged choice of

profit over safety was apparently manifested in 7-Eleven's failure to stop franchise stores from selling Feel Free, to warn customers of the dangerous side effects of Feel Free, or to train franchisees about the sale and marketing of Feel Free or other kratom products—despite its alleged ability to do all three. *Id.* at 20–21.

There is one specific communication from 7-Eleven described in the complaint. Apparently, in April 2023, U.S. Marshals seized a substantial amount of Feel Free from Botanic Tonics's manufacturing facility at the direction of the FDA. *Id.* at 26. The complaint alleges that in the wake of this seizure, 7-Eleven sent an email to its franchisees saying that "the sale of Feel Free is prohibited by the 7-Eleven Brand Standards in the Operations Manual." *Id.* at 27. The complaint further alleges that this email was framed as a "reminder" that the sale of Feel Free was always prohibited (although it bears noting that the complaint does not attach the email). *Id.*

Torres asserts two causes of action against 7-Eleven: for a violation under the unfair-practices prong of California's Unfair Competition Law, and for unjust enrichment. Notably, Torres does not assert claims under the other two prongs of the UCL—the "fraudulent" prong or the "unlawful" prong. Under the unfair-practices prong, Torres argues that 7-Eleven is liable for permitting the product to be sold in stores, or at least for not disclosing the product's dangers to customers. The parties agree that the unjust enrichment claim rises and falls with the UCL claim.

II

7-Eleven advances a single argument in its motion to dismiss: that even if the company knew of all the dangers described in the preceding section, there is no liability for a failure to disclose under the unfair-practices prong of the UCL because no *other* source of California law creates a duty to disclose. 7-Eleven focuses on California common law in particular, citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997). The *LiMandri* case established the common law standard for when nondisclosure can amount to actionable fraud: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; [or] (4) when the defendant makes partial representations but also suppresses

some material facts." *Id.* at 336. 7-Eleven argues that because the complaint does not satisfy the *LiMandri* test, and because no other independent source of law imposes a duty to disclose the harmful effects of Feel Free, there can be no liability under the UCL's unfair-practices prong.

But there is no reason to think that liability under the UCL in this context is restricted by preexisting law. To the contrary, California courts have made clear that the California Legislature intended the unfair-practices prong of the UCL to reach beyond existing law. For example, in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163 (1999), the California Supreme Court noted that "the statutory language . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Id.* at 180. The court went on: "The section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Id.* at 181 (quoting *American Philatelic Society v. Claibourne*, 3 Cal.2d 689, 698 (1935)). And the Legislature aimed to avoid hardline tests for unfair practices, as "it would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited." *Id.* (quoting *People ex rel. Mosk v. National Research Company of California*, 201 Cal. App. 2d 765, 772 (1962)). Given that aim, it runs contrary to the goal of the statute to insist that a duty to disclose must have been created by the common law—or by some other source of law—for liability to exist under the unfair-practices prong of the UCL.

Moreover, it's worth recalling that there are three ways to violate the UCL: fraudulent practices, unlawful practices, and unfair practices. If Torres were asserting a claim under the fraudulent-practices prong, it would make sense to require him to satisfy the legal standards for pleading a fraudulent omission claim. But there is no reason to think that the only way a defendant can incur liability under the UCL for the failure to disclose information is through the fraudulent-practices prong. If the withholding of information is part of an unfair business practice that falls short of outright fraud, it could still give rise to liability (assuming the tests developed for establishing liability under the unfair-practices prong are met).

To be sure, there is confusion in the California courts (and the federal courts) about what constitutes an unfair practice under the UCL. The California Supreme Court recently noted that three different tests are currently being applied, but it did not approve or disapprove of any. *Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County*, 9 Cal.5th 279, 303 & n.10 (2020). First, there is a line of cases applying the "balancing test," which requires courts to "weigh the utility of the defendant's context against the gravity of the harm to the alleged victim." *Id.* at 303 n.10 (internal quotations omitted). Second, there are cases applying the "tethering test," which requires that the wrongfulness of the conduct at issue "be tethered to specific constitutional, statutory or regulatory provisions," or the policy or spirit of such a law, even if there may be no precise violation of those provisions. *Id.* (internal quotations omitted); *see also id.* at 302. And third, there is the "section 5 test," which is drawn from that provision of the FTC Act, and which asks whether there is substantial injury to consumers that is not outweighed by countervailing benefits to consumers and competition and that consumers themselves could not have reasonably avoided. *Id.* at 303 n.10 .[1] What is important for this ruling is that none of those tests require a plaintiff pursuing a claim under the unfair-practices prong to allege the failure to comply with independent legal requirements—relating to a duty to disclose or anything else. Rather, these courts provide guidance for an individualized determination about whether a company engaged in unfair business practices. *See Lozano*, 504 F.3d at 736–37.

In support of its theory, 7-Eleven cites *Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824 (2006). But it cites to the portion of that opinion about whether there was a violation of the Consumer Legal Remedies Act, and not to the separate portion about the unfair-practices prong of the UCL. Dkt. No. 31 at 11 (citing *Daugherty*, 144 Cal. App. 4th at 835). The portion about the unfair-practices prong does not look to either the Consumer Legal Remedies Act or the *LiMandri* test for an otherwise-existing duty to disclose. Rather, the court asked

---

[1] It is unclear whether the section 5 test is viable in consumer cases. *See Lozano v. AT&T Wireless Services*, 504 F.3d 718, 736 (9th Cir. 2007). *But see Nationwide Biweekly*, 9 Cal.5th at 303 & n.10.

whether the alleged failure to disclose was a UCL violation. And, to answer that question, the court applied tests developed by California courts for determining whether the unfair conduct prong of the UCL has been violated. *Daugherty*, 144 Cal. App. 4th at 838–39.

Finally, 7-Eleven relies on *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018), interpreting that case as expressly requiring that courts treat a common law duty to disclose as a prerequisite to a UCL claim for unfair practices, arguing that, even if state law is unclear, the question of how to interpret it has been settled for federal courts. The argument is based on one line: "Mars' failure to disclose information it had no duty to disclose in the first place is not substantially injurious, immoral, or unethical." *Id.* at 867. That line, read in isolation, is question-begging, and it might cause one to speculate that perhaps the court meant that a preexisting duty to disclose must exist. But, read in context, the line does not support 7-Eleven's argument. In *Hodsdon*, the court started by concluding that the *LiMandri* test did not create a duty to disclose. The court then ruled that the plaintiff's failure to satisfy the *LiMandri* test invalidated their fraudulent-omissions theory for violations of the Consumer Legal Remedies Act. The court applied that same reasoning to the plaintiff's claim under the fraudulent prong of the UCL. All of that makes sense—*LiMandri* is a fraud test, and those were fraud claims. *Id.* at 861–65. Then the court turned to the plaintiff's claim under the unfair-practices prong. It opened this discussion by stating: "Unlike the other two UCL prongs, the lack of a duty to disclose [under *LiMandri*] does not necessarily dispose of claims under the unfair prong." *Id.* at 865–66. The court then applied the tethering test and the balancing test. The language quoted by 7-Eleven comes at the beginning of the court's application of the balancing test (referred to in the opinion as the *South Bay* test). So *Hodsdon* should not be understood as saying that a duty to disclose under *LiMandri* or some other source of law must be established for a failure to disclose to be the basis of liability under the unfair-practices prong of the UCL.

Rather, *Hodsdon*'s analysis under the unfair-practices prong is best understood as a fact-specific consideration of whether the conduct in question—the nondisclosure—was sufficiently harmful or unethical to support a UCL claim. As part of that analysis, the *Hodsdon* court

apparently considered it relevant whether the disclosure was required by some other source of law. But it did not hold that the absence of such a requirement is always dispositive. Immediately after the key line, the court cited *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (2006), describing its relevance in a parenthetical: "holding that the use of less expensive tubular steel exhaust manifolds did not violate public policy because the defendant made no representation about the composition of the manifolds and the plaintiffs did not allege a safety concern or a violation of the warranty." *Hodsdon*, 891 F.3d at 867. Then the rest of the paragraph considered the particular failure to disclose that was at issue: not mentioning the use of slave labor in the supply chain on the label of a product when that information was disclosed elsewhere and where there was no other legal duty to put the information on the label. *Id.* That hardly sounds like the Ninth Circuit was establishing a categorical requirement that courts must find a violation of a duty to disclose in common law or other statutory law as a prerequisite to finding an unfairness-prong violation. The better interpretation is that the court evaluated the particular alleged injury, considered whether there was a duty to disclose under some other source of law as part of the inquiry, and ultimately concluded that the conduct in question was not sufficiently harmful or unethical to support a UCL claim.

In fairness to 7-Eleven, a couple of district court rulings may have treated the language from *Hodsdon* in the same way that 7-Eleven asks this Court to. For example, one ruling mentioned that if the plaintiffs had been unable to state a duty to disclose under the fraud prong (applying *LiMandri*), they "likely" would have had their unfair-practices prong claim dismissed, citing *Hodsdon* and quoting the same line that 7-Eleven quotes. *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 856 (N.D. Cal. 2022). Another ruling dismissed the plaintiffs' unfair-practices prong claim, citing the same language. *In re Samsung Galaxy Smartphone Marketing and Sales Practices Litigation*, No. 16-CV-06391-BLF, 2020 WL 7664461, at *11 (N.D. Cal. Dec. 24, 2020). But the main point of that decision appears to be a more elementary one: there could be no duty to disclose under the unfair-practices prong (or under the UCL at all) absent sufficient allegations of the defendant's knowledge. *Id*. In that context, a statement along the lines of "the

defendant has no duty to disclose something they have no duty to disclose" is understandable, even if worded in a confusing, circular fashion. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 n.5 (9th Cir. 2012) ("[T]he failure to disclose a fact that a manufacturer does not have a duty to disclose, *i.e.*, a defect of which it is not aware, does not constitute an unfair or fraudulent practice."). But this is a far cry from saying that there can never be a duty to disclose under the unfair-practices prong if no other source of law already imposed such a duty. Anyway, to the extent these district court rulings were intended to adopt 7-Eleven's interpretation of *Hodsdon*, this Court disagrees with them.

III

Other questions remain about the viability of the claims against 7-Eleven. For example, as already noted, it's not clear that the complaint has adequately alleged that 7-Eleven knew about the dangers. But 7-Eleven's only argument in its motion to dismiss is that it could never be liable for unfair business practices, even if all the other allegations in the complaint are true, because of the absence of an independent legal duty to disclose. Because that argument is wrong, the motion to dismiss must be denied.[2]

**IT IS SO ORDERED.**

Dated: December 21, 2023

_____

VINCE CHHABRIA
United States District Judge

---

[2] In its opening brief, 7-Eleven also argues that the complaint fails to allege causation because Torres could have bought Feel Free from other stores. 7-Eleven wisely abandons this argument in its reply.